IRVING, J.,
dissenting:
¶ 16. The majority finds that the circuit court did not err in granting a directed verdict against Manda Griffin because she failed to present sufficient evidence to create a jury issue as to the proximate cause of Gracie M. Stephens’s death. The basis for the circuit court’s ruling, which is embraced by the majority, is that Griffin’s expert, Dr. William Truly, was not competent to testify as to the cause of Stephens’s death. Specifically, the circuit court found:
¶ 17. Adequate proof of proximate cause in a medical malpractice action of this type requires evidence that in the absence of the alleged malpractice a significantly better result was probable or more likely than not.
There is nothing in the testimony of Dr. Truly, Nurse Ross, or anyone else of the chances of sparing the life of Ms. Stephens had Nurse Crenshaw — had Nurse Crenshaw’s care of Ms. Stephens had been exactly as Nurse Ross and Dr. Truly think it should have been.
Without this evidence, the plaintiff has failed to make a prime facie case....
¶ 18. Since I believe both the circuit court and the majority have erred, I dissent. I would reverse and remand this case for a new trial.
¶ 19. Dr. Truly was accepted as an expert in the practice of emergency and family medicine. In order to properly appreciate and evaluate Dr. Truly’s testimony, I will present it in the question-and-answer context as it occurred, complete with objections and rulings by the circuit court. On day one, Dr. Truly testified as follows:
Q. Dr. Truly, what were you asked to do with regard to this particular case?
A. I was asked to review this case, as I understand it, and give an opinion as to the cause of death.
Q. And could you tell the jury exactly what you did in doing so?
A. I reviewed the medical records as relates to this patient. I reviewed her admission of 12-29. I reviewed her admission of November 11th. I reviewed her renal status. I reviewed her admission to the PACU. I reviewed Dr. Pin-son’s operative note, as well as his procedure. I reviewed the nursing notes, as well as the laboratory and everything *675 that happened in PACU. I reviewed when she was transferred from PACU over to surgery. So I was able to develop a total picture of this patient’s evaluation and her management and give some reasonable cause or give a cause in my opinion of why she died and why she bled to death.
Q. And did you indeed form such opinions?
A. Yes.
Q. Could you share those with the jury?
NMMC’S ATTORNEY: May it please the Court, I object to that. This witness has not been properly qualified to state that opinion.
GRIFFIN’S ATTORNEY: Your Honor, as was stated in the evaluation of Mr. Truly during his proffer, he — as a part of his experience in the fields of emergency medicine and family medicine, he has been called upon to formulate opinions with regard to cause of death. He has been qualified as an expert in court and testifying in these particular areas based on his experiences in family medicine and emergency medicine. These are the designations that he was given and these are the qualifications for his giving those opinions, and his opinions as stated today will be consistent with the designation that was provided to the Court.
THE COURT: The Court is of the opinion that Dr. Truly is qualified by his knowledge, skill, experience, training and education in the fields of family and emergency medicine to testify and state his opinion as to the cause of death in this case. Certainly, the Court is of the opinion that both family physicians and emergency room physicians are qualified to form opinions as to the cause of death of persons under their care. So the objection is overruled. You may answer the question.
Q. (Griffin’s Attorney) The question, Dr. Truly, was whether you formed opinions and what those opinions were?
A. Yes.
THE COURT: I believe he had answered he had formed an opinion.
GRIFFIN’S ATTORNEY: That’s correct, Your Honor.
THE COURT: The question now is what is his opinion.
GRIFFIN’S ATTORNEY: Thank you.
A. Yes. I have formed an opinion as to the cause of this patient’s death that I would like to share with you. And my opinion is that this patient, one, bled to death. And to share with you what happened, this patient went to — went to surgery on January 4th of 2001, and before she went to surgery, she by definition had a normal 4 blood volume, what we call a normal hemoglobin, which was like 11.8 and that was done on 12-29-2000. She went and she had her surgery, and, of course, all of — we now know what happened in surgery. Dr. Pinson inserted a catheter into the patient’s carotid artery. His intent was to insert a catheter into the patient’s internal—
NMMC’S ATTORNEY: I apologize, but I have to object to this. This testimony is clearly far afield of the expertise of someone in family medicine and emergency medicine. To offer an opinion as to the cause of death is one thing, but to comment upon the care provided by physicians well far afield from his specialty, who he has admitted he does not have expertise in, is irrele *676 vant and inappropriate. I want the record to reflect my objection, Your Honor.
THE COURT: The objection on that point is sustained.
GRIFFIN’S ATTORNEY: Your Honor, if I may, with regard to the testimony that he has given with regard to these actions by Dr. Pin-son, these records that been admitted into the evidence in this case, as well as testimony and questions from Mr. [NMMC’s attorney], testimony from Ms. Ross, merely state the facts that are reflected in the records. Dr. Pinson performed this operation. It went a certain way. Mr. [NMMC’s Attorney] asked questions of Ms. Ross regarding what happened during the surgery. He is not giving opinions about whether that was right or wrong. He’s saying that’s what happened.
NMMC’S ATTORNEY: Your Hon- or, perhaps we could be heard on this outside the presence of the jury.
THE COURT: All right. It’s a good time to take a recess anyway, give the jury a break. Ladies and gentlemen, go with the bailiff. Again, do not discuss this case among yourselves or form or express any opinions about the case.
(JURY LEAVES THE COURTROOM AT 3:13 P.M.)
THE COURT: All right. Mr. [NMMC’S attorney].
NMMC’S ATTORNEY: May it please the Court, I certainly understand the Court’s ruling with respect to the hospital’s objection that would allow this witness proffered and accepted by the Court over objection as an expert in family medicine and emergency medicine. We did not contest his qualifications in that regard, as the Court knows. However, it is anticipated that at some juncture this witness is going to be asked a question of connecting up the alleged neglect of the nurse to his theory of cause of death, and it is our strong position, Your Hon- or, that he has not demonstrated the qualifications necessary to offer such an opinion. It goes without saying, and I think even Nurse Ross conceded, that in order for something to be done that would have altered the outcome for this patient, action would have had to have been taken by one of her attending physicians, either a general surgeon or an anesthesiologist. Even if we accept Nurse Ross’ criticisms that the nurse failed to inform the doctor correctly, intervention would have required action by a physician. This physician, Dr. Truly, does not know and is not an expert on what is done by anesthesiologists or general surgeons in any clinical circumstance. He has not demonstrated that expertise. In Hall vs. Hilbun, Hardy vs. Brantley, Palmer vs. Biloxi Regional, Cheeks vs. Biotech, Troupe vs. North Mississippi Medical Center, a case tried in this very court, Hubbard vs. Wansley, the Supreme Court said repeatedly that this Court, the trial court, is the gatekeeper, and that not every doctor is qualified as an expert in every malpractice case. Dr. Truly is without question, according to the Court, an expert on two topics, family medicine and emergency medicine. Any effort by him to causally connect the alleged nurse negligence in this case to this patient’s *677 death is far afield from his expertise, and we object to it.
THE COURT: MR. [Griffin’s Attorney].
GRIFFIN’S ATTORNEY: Yes, Your Honor. The expertise that Mr. Truly — Dr. Truly has with regard to family medicine and emergency medicine is established in the hospital setting, and certainly — and these questions are going to bear this out — Dr. Truly has experience dealing with nurses and dealing with patients in post-surgical care situations, as he stated. So to that extent, we submit to the Court that Dr. Truly is not only qualified to talk about issues relating to the alleged breaches and whether that was related to the cause of death, but also, if he were to be questioned about hospital procedures as they related to nurses, he’d be qualified to talk about that. My understanding of Mr. [NMMC’S’s attorney’s] objection was whether or not Dr. Truly could talk about any kind of breach or any kind of action with regard to Dr. Pinson and this surgical intervention. Dr. Truly has already stated that he is not a surgeon, and I don’t believe his testimony, as reflected by the court reporter, will indicate that he is talking about any kind of breach on the part of Dr. Pinson. I think the record will reflect that he is merely stating that the record indicates that during the course of the surgical procedure these things happened. He hasn’t given an opinion, and I don’t think he is going to give an opinion as to whether or not such constituted anything other than what the record said or did.
THE COURT: Well, the defense objection is, among other things, is Dr. Truly is ... I have allowed him to testify as to his opinion as to cause of death. The defense objection is ... is any further testimony by him going to the issue of proximate cause. Is that correct, Mr. [NMMC’S attorney]?
NMMC’S ATTORNEY: It is exactly that, Your Honor, and Counsel misunderstands the objection, and, Your Honor, an anticipatory objection was made because Counsel’s questions — and I am not criticizing him — are simply state your opinion. I have no idea when Dr. Truly is going to offer that opinion to the jury, but I want to make the objection now, because I anticipate that it’s coming. The record will clearly reflect that Dr. Truly was identified to us as an expert within the last two weeks. I confessed the substitution of Dr. Truly for Dr. Gold-stein. However, the order from this Court specifically reads that we reserve all objections as to his qualifications and the competency of his opinions. And my point is this: Dr. Truly can not tell us what any anesthesiologist or general surgeon would have done or should have done had their theory of recovery been correct. Had the nurse been negligent and had she been obligated to give more information to Dr. Thompson, Dr. Byars, Dr. Pinson, Dr. Douglas, Dr. Eldridge, if their theory is correct and she owed them more information, he can not tell us, because he is not an expert as to what they would have done or what they could have done or should have done, and for that reason we object to him offering any opinion on proximate causation.
*678 THE COURT: MR. [Griffin’s Attorney], that is the — the issue is whether or not Dr. Truly can offer an additional opinion that — on causation of death. What — what do you say to that?
GRIFFIN’S ATTORNEY: Well, I think, Your Honor — and I want to be clear on what our purpose for having Dr. Truly testify is.
THE COURT: Tell you what, continue your examination of Dr. Truly. The jury is outside the presence of the courtroom.
GRIFFIN’S ATTORNEY: Backtrack to where he left off, Your Honor?
THE COURT: Yes, sir.
Q. MR. [Griffin’s Attorney] Dr. Truly, I’d like you to tell the Court, you were speaking as we left off with regard to the issue of the surgical procedure of Dr. Pinson. And my question to you is: After that occurred, do. you have any opinions as to whether or not the cause of death was related to anything that occurred after that?
A. Yes.
Q. And that’s what I wanted to ask you questions about and what I want you to inform the Court in this proffer.
A. My opinion — my opinion — my opinions are related to what occurred after surgery, and as I was attempting to explain, my opinion is that the patient bled to death and that is based on the fact that before she received her surgery, she had a, by definition, a normal hemoglobin of 11.8, and she entered PACU at 15:24, if I recall correctly. She was in PACU 40 minutes, and her hemoglobin had dropped from its baseline, from 11.8 to a 9.5, which is around about 4:04 or 4:10, and it continued to drop over a period of 2 hours and 45 minutes to a 6.8, which is further evidence of bleeding, and by the time — I think that was about 6:49. Eleven minutes later, around about 7:00, she had dropped down to a 6. That’s a tremendous amount of loss of blood as it relates to the perfusion of the brain, and I think as a consequence of her acute loss of blood, as a consequence of her sustained episodes of hypotension that she experienced in the PACU, that she suffered a cardiac arrest, and I agree with the death certificate, that she had hypertension, and that all of this was due to her encephalopathy, as seen on the EEG, that speaks to the whole issue of hypoxic brain injury as seen on the CT scan, that speaks to the issue of destruction of the gray white matter, brain edema and brain injury. So I think that this acute bleed, this profound hypotension over a period of a couple of hours, with no intervention led to this patient’s death.
Q. And, Dr. Truly, do you have an opinion as to whether or not the breaches as elaborated by Ms. Ross caused or contributed to the cause of death?
A. I think it was a contributing cause of death, because my opinion is that nurses are not helpless ladies, that nurses have certain rights. If Ms. Crenshaw didn’t know, she should have known that in the face of, one, blood loss as represented by falling hematocrit, in the face of two, sustained hypotension — sure, there were times when there was intervention, where boluses of normal saline was given, vasoconstrictors in the form of Neosynephrine was given that — that normalized the blood pressure, but that was only brief. The real state of this patient returned to its original state, sustained hypertension, and if she — if she — if she didn’t know, she should have known that this was something ominous and grave, that this represented blood loss, and that the only doctor who could have intervened in the presence of acute *679 blood loss would have been the surgeon, the proper doctor.
Q. And hypotension meaning blood pressure lower than normal?
A. Yes.
¶ 20. After an overnight recess, Dr. Truly continued his testimony. Again, I present that testimony in the context that it was given, complete with objections and the rulings of the circuit court:
Q. Good morning, Dr. Truly.
A. Good morning, sir.
Q. When we broke yesterday, if I am correct, your testimony had begun with your discussion of the issue of lack of oxygen to vital cells. If you could follow-up on where your testimony was to the jury?
A. I am specifically trying to recall specifically the issue that we were talking about, but I think it was with relevance to the cause of death of Ms. Gracie, and I think I was — I was talking about her being transferred to the PACU. I think I recall that correctly. She was transferred to the PACU following her surgery, and as a consequence of her being transferred to the PACU, there were certain kinds of things that happened in the PACU. And she was transferred, if I recall correctly, at 15:24, which is about 3:24. While in the PACU, she had falling blood pressures. She didn’t just have a low type blood pressure that you saw reflected on the screen. She had falling blood pressures. What, as I would interpret as an emergency room physician, blood pressures that were dangerously low. In the face of her failing blood pressures, she had lost 20 percent of her blood. Meaning that we have about five liters, or five quarts as some people say, and she had lost one of hers. Well, how do we know that? We know that because we looked at what her blood level was before she went into the PACU, and before she went into PACU, her blood count was 11.5. And after having been in PACU for 40 minutes, she dropped from her baseline down to a 9.5, and this is around about 4:10 or 4:04. Interestingly enough, 2 hours and 45 minutes later she didn’t just drop to a 9.5 and stop. Based on the record, the medical record presented to me, she continued to drop. At 18:49 or 6:49 she had dropped all the way down from a 9.5 at 4:10 to a 6.8. So she had dropped all the way down to a 6.8 around about 6:49, and 11 minutes later she had dropped all the way down to a 6. So when you look at all of the falling blood pressures, and when you look at the falling blood count, meaning her hemoglobin he-matocrit, that is a loss of blood, and that is why her pressure was low, because she was losing blood. She was trying to tell Nurse Crenshaw something when she got into trouble around about 17:51. There was a change in her mental status, and there was a change in her physical status. When you go back and look at the record, she is calm, she has good strength, but around about 17:50, which is about 5:50, she is uncooperative. She is pulling off her oxygen. She is pulling off her blood pressure cuff. She is flailing around in the bed. She falls back. She is restless. In the presence of a falling blood pressure and in the presence of a falling hematocrit, when patients become restless and uncooperative, and there is a change in their status and they develop this kind of-kind of air hunger, that means that they are bleeding. There is a change in her status. So at this particular time something *680 needs to be done. So she became unresponsive about 26 minutes after she started flailing around and being restless and being short of breath, and she became unresponsive because she didn’t have enough blood left to sustain her, and that’s why she became unresponsive.
Q. And, Dr. Truly, if you could, give the jury an understanding what you mean by not having enough blood left? A. Well, blood carries the oxygen that we breathe, and what I mean by that, if you simply take water and put it in a balloon, it will expand, and if you punch a hole in the balloon, the water comes out. So we need blood to maintain our balance, to maintain our blood pressure. We need blood to be delivered to our vital organs; our brain, our heart, our liver, our lower extremities, upper extremities. We have to have blood, and when we suddenly lose blood — it’s one thing when you lose blood over a period of — over a period of six months, or three months, as a consequence of some kind of an anemia, but it is another thing when you lose that amount of blood over a period of two to three hours. That is difficult to — it is difficult to sustain that kind of blood loss, and when you lose that kind of blood loss, your entire body is going to shut down. You are going to become simply unresponsive and go into a cardiac arrest.
Q. And what impact did the blood loss that you are talking about have on Ms. Stephens, if any?
A. The blood loss that I am talking about, that had on Ms. Stephens, is that it caused her to go into a cardiac arrest. It caused her to stop breathing. Caused her heart to stop breathing, and it caused the intervention of emergency measures, and which is what they did. There was an intervention of emergency measures, where you beat on the chest, you put a tube down, you give life-saving medicines to keep the blood pressure up and to try to ... to ... restore circulation. They worked on Ms. Gracie from the time she became unresponsive, which was 6:26, if I recall correctly, all the way over to 19:42. So it was from 6:26 all the way over to— not — yeah, 6:26 all the way over to 7:42. 7:42. So they worked on her, and they finally restored her, but by the time they restored her, when you go and look in the record, she was evaluated by a Dr. Milev, who was her kidney doctor, and he gave her what was known as a scale, called a Glasgow scale, or some people call it a Glaseo scale. It is a scale that tells us how much brain damage there is, and he gave her a scale of 3, and people who have a scale of 3, there is an 85 percent chance that either they will die, or either they will remain a vegetable, and this is what happened in her case. The next day she had a CT scan, and the CT scan showed brain injury. Specifically it shows a destruction 10 of what we call gray and white matter, collection of fluid on the brain, brain injury. She also had what was known 12 as an EEG. That, simply speaking, showed hypoxic brain injury, which means by definition her brain is of no function, or her brain is dead. My impression is that this patient died as a consequence of blood loss, sustained hypotension that she experienced in the PACU, and it was the blood loss, the lack of oxygen, that caused her brain injury, that we call 19 hypoxic brain injury, or encephalopathy, as some people 20 might call it, which is on her death certifi *681 cate, and this is what caused her death and caused her not to ever recover.
Q. And Dr. Truly, do you have any opinions as to whether or not the breaches as alleged by Ms. Ross had anything to do with this cause of death?
A. I — I think that in the — I think that in the — yeah, the answer is yes, because in the PACU there is a — you have a falling blood pressure, and you have a falling hematocrit, and that kind of information — look, we have a patient whose blood pressure is critically low, whose hematocrit has fallen. This represents blood loss. So a doctor, or a resident, or a third-year student should know that falling blood pressures, falling hematocrits, a sudden change in a patient’s status, being restless and uncooperative, and falling back on the bed, and getting out of control is a representation that something is wrong here. This is just not right. Something is wrong here, and there needs to be an intervention.
Q. Dr. Truly, in your review of the medical records, did you observe at any time that Ms. Stephens had any kind of respiratory distress?
A. She experienced respiratory distress at 5:51. There were two components of her illness while in the PACU. One, there was a hematoma, swelling of the neck; and two, there was a description of respiratory distress in the form of her respirations were shallow. Normally when people breathe, they breathe normally. Their respirations are not shallow. Coupled with, if you are in a PACU, or if you are in an ICU, or wherever you are in a hospital, and a loved one’s respirations become shallow, and they are basically lethargic, meaning it seems as if they just don’t have any energy, or they just can’t do things, then that’s a danger sign that there is a change in this patient’s status.
Q. And Dr. Truly, did you notice anything else in the medical records, the nurse’s notes in the PACU, which would indicate to a nurse that there was blood loss occurring?
A. What I noticed was the fact that when she first went into the PACU, there was no blood loss, when she first went in. Forty minutes after being in the PACU, there is a documentation of blood loss. What is the documentation? It changed from a normal blood count of 11.5, which is near normal, down to a 9.5. That means there is a 20 percent blood loss, that she has dropped down, coupled with the sustained hypotensions, sustained low blood pressures. I need to share with you, however, that there were times when this patient was given what’s known as boluses of fluid that equal to in one — couple of instances less than a glass of water, or 200 ccs. In some instances, more than a glass of water, 300 ccs, and that would cause her blood pressure to go up, but it would never stay up. It would never sustain. There were times when her blood pressure was critically low, and she was given blood pressure medicines, called Neosynephrine, that would make her blood pressure go up, but after a while her blood pressure would go back to the original level, the kind of level that you would see as a consequence of not having enough volume or not having enough blood to keep her pressure at a normal level. She simply just didn’t have enough fluids in her body, enough blood in her body to keep it at a normal level. You could give her boluses, you could give her all of these medicines, and be *682 cause the fluid, the blood, wasn’t there, she simply would drop back down. And so, my interpretation of that is that here is a lady who has falling blood pressures and who has a falling hematocrit, who was uncooperative and restless, and that kind of information, that is important to the patient, was not ever communicated to the individual who did the surgery. Dr. Truly, you spoke previously about encephalopathy as being her end result, in terms of her brain damage. A. Yes.
Q. Did you, in determining the cause of death in this case, rule out any other causes of death?
A. Well, you know, Ms ... Ms. Gracie had several diseases. One, she had what was known as end-stage renal disease, and what that basically means is that her kidney, or kidneys for that matter, simply were not functioning for her. So she had to have what was known as substitute kidney. Her substitute kidney was the peritoneal dialysis, and the same as hemo-dialysis, it is really by definition a substitute kidney. It is a kidney that works for you when your kidney no longer functions. So what is the purpose of the kidney? The purpose of the kidney is to clear all accumulated waste, and if we do not clear that accumulated waste, then, of course, we die. So when people’s kidneys fail, we have to have something like a substitute kidney, which is the hemodialy-sis machine, which is one way of keeping the blood free of waste. Of course, the other way is peritoneal dialysis, where you put a tube into the abdomen and you feed a dialysate, a solution into the abdomen, and through a process the waste comes from the capillaries that line the stomach into the dialysate, and it comes out. So that is how you are able to— to use peritoneal dialysis to clear the body of waste. So she — but it was not — it was not — end-stage renal disease does not mean the end of life. I manage patients with end-stage renal disease who are 70, 80 years of age. So it doesn’t mean the end of life. We see people all the time who are in their 70s and 80s on dialysis. So I was never impressed that that was the cause of death. She also had the complications of diabetes, meaning that her vision was affected. The vessels lining her retina was affected, that we call 14 diabetic retinopathy. That was not the cause of her 15 death. She also had what they call sepsis, and when you 16 go back and look at her record, Ms. Gracie had what was known as chronic peritonitis. She had a chronic infection of her peritoneum, and she — I don’t recall her, when she was in PACU, having what was known as acute peritonitis. Acute peritonitis is where you have the chills, the fevers, the rigor, the stomach is tender. You punch on the belly and remove your hand, and there is what is known as rebound tenderness. So I don’t ever recall that, but she did have chronic peritonitis from the catheter that was in her abdomen. She had a lot of blood cultures done after ... after her ... she became brain dead, and there is nowhere in the record where an organism was found in her blood, that I recall. Usually, when people have — there is a difference between — there are some people who— who — who define sepsis as an infection. I need to share with you that there is a difference between an infection and a septicemia. People have tonsilitises, and their white count goes up, but they don’t have septicemia. *683 Septicemia means, or bacteremia means the finding of bacteria in the blood stream. That is how we define bacteremia or septicemia. It is characterized by fevers and chills and a bacteria in the bloodstream. A bacteria was never found in her blood stream. When you go back and you look at her record, she did have white count of 12,000, with normal being about 10, white count of 10, maybe 11, but before Dr. Pinson did the surgery, it was 12,000. When you go back and look at her white count after her— around about 8:40, which was January 4th, 2001, she has a white count of 22,000. Now the real question is, is that related to — is that a septicemia? Because what happens is when an individual has a cardiac arrest, and all of the intervening measures take place, we now know that it is not unusual to find an elevated white count. I’m not saying to you that—
NMMC’S ATTORNEY: Your Honor, may it please the Court, I apologize for interrupting. I’m being as patient as I can be, but this is so far afield from this witness’ disclosure, that I am compelled for the record to object.
GRIFFIN’S ATTORNEY: I would impose a question, Your Honor.
THE COURT: The objection is sustained. From what the Court recalls, the expert’s proposed testimony would be as reflected in the filings with the Court.
GRIFFIN’S ATTORNEY: Thank you, Judge.
Q. Dr. Truly, do you have an opinion as to whether or not failures or omissions of North Mississippi Medical Center caused or contributed to Ms. Stephens’ death?
A. Yes.
Q. Please share that opinion with the jury.
A. My opinion is that the — that the negligence on behalf of the hospital contributed and proximately caused her death by the mere fact that there was — one, there was a failure to recognize the significance of a falling blood pressure, coupled with a falling hematocrit, coupled with a patient who is uncooperative and restless, coupled with the change in her status, coupled with air hunger. So there was a failure of the hospital to respond to these changes of a falling blood pressure and a falling hemato-crit or hemoglobin. The falling he-matocrit, the hemoglobin, represents that she is bleeding.
Q. Are those opinions given to a reasonable degree of medical probability? A. Yes.
Q. Dr. Truly, when did Ms. Stephens expire?
A. If I recall correctly, I think she actually expired on the 10th or the 11th of January 2001.
Q. And what was her condition between the date of her death and the date of the surgery?
A. She was in a vegetative state.
¶ 21. It seems clear to me that, based on Dr. Truly’s testimony, Griffin was entitled to have a jury consider whether the negligence of Nurse Crenshaw in not timely notifying Dr. Pinson was a proximate cause of Stephens’s death. Surely a jury might find that the delay in notifying Dr. Pinson was a proximate cause of Stephens’s death, as the delay either allowed her to bled to death or substantially increased her chances of dying from a tardy intervention by Dr. Pinson once he was notified. To suggest that Griffin failed to present adequate expert testimony because Dr. Truly was not qualified to give *684 an expert opinion in the field of surgery evades the crucial question: should Nurse Crenshaw have notified Dr. Pinson earlier than she did, and did this delay proximately contribute to Stephens’s death?
¶ 22. For the reasons presented, I dissent. I would reverse and remand for a new trial.
KING, C.J., AND LEE, P.J., JOIN THIS OPINION.